UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

NATHANIEL GREEN,

                                    Plaintiff,

                                                                      9:10-CV-121

v.

                                                                      (DNH/TWD)

MR. LAWRENCE SEARS, Superintendent,
Ogdensburg Correctional Facility; MRS. A.
CHARLEBOIS, Deputy Superintendent of Programs;
MRS. PATRICIA BURNELL, Deputy Superintendent
for Administrations; MR. LAWRENCE KANALY,
Security Captain; MR. DOTY (Sgt); MR. LAFAYE
(Sgt); MR. PATAK, (Sgt); MRS. HELGA ROSS,
Inmate Record Coordinator; MRS. SUSAN MCLEAR,
Inmate Accounts; MR. GERRY MOLNAR, Inmate
Grievance Coordinator; MRS. A. BALDWIN,
Correctional Counselor; MR. PHIL JESSMAN, Mail
Room Clerk; MR. BALCOM, Correction Officer;
MR. FRARY, Correction Officer; and MR. CURRIER,
Correction Officer,

                                    Defendants.

_____

APPEARANCES:                              OF COUNSEL:

NATHANIEL GREEN
Plaintiff *pro se*
09-R-2641
Wallkill Correctional Facility
Box G
Wallkill, New York 12589

HARRIS, CONWAY & DONOVAN, PLLC          MICHAEL C. CONWAY, ESQ.
Counsel for Defendant Philip Jessmer
5 Clinton Square – The Patroon Building
Albany, New York 12207

HON. ERIC T. SCHNEIDERMAN                C. HARRIS DAGUE, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for the Remaining Defendants
The Capitol
Albany, New York 12224

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## REPORT AND RECOMMENDATION

*Pro se* Plaintiff Nathaniel Green has commenced this action pursuant to 42 U.S.C. § 1983

alleging the deprivation of his civil rights while he was confined in the Ogdensburg Correctional

Facility ("Ogdensburg"). (*See generally* Dkt. No. 52-2.) Plaintiff claims that various requests

for the disbursement of funds from his inmate account were denied, his cell was searched

multiple times, he was intimidated, and mail to his attorney was tampered with or sabotaged, all

in retaliation for the filing of grievances and Freedom of Information Law ("FOIL") requests. *Id.*

Plaintiff also contends that the denial of his disbursement requests was discriminatory, that his

FOIL requests were wrongfully denied, that he was deprived of documents necessary to appeal

from a grievance denial, and that he was defamed. *Id.*

Plaintiff has sued Defendants Lawrence Sears, retired Superintendent at Ogdensburg;

Marian Charlebois, Deputy Superintendent for Programs at Ogdensburg; Patricia Burnell, Deputy

Superintendent for Administration at Ogdensburg; Lawrence Kanaly, retired Captain and Deputy

Superintendent of Security at Ogdensburg; David Doty, Correction Sergeant at Ogdensburg;

James LaFave, incorrectly sued as "Mr. Lafaye," Correction Sergeant at Ogdensburg; Scott

Patak, Correction Sergeant at Ogdensburg; Helga Ross, Inmate Records Coordinator and FOIL

Officer at Ogdensburg; Susan McLear, Facility Steward at Ogdensburg; Gerry Molnar, Inmate

2

Grievance Supervisor at Ogdensburg; Joseph Balcom, Correction Officer at Ogdensburg;

Richard Frary, Correction Officer at Ogdensburg; Robert Currier, Correction Officer at

Ogdensburg; and Philip Jessmer, incorrectly sued as "Phil Jessman," Mail Room Clerk at

Ogdensburg.[1]  (Dkt. No. 18 at p. 1.[2])

Defendant Philip Jessmer ("Jessmer") has moved to dismiss Plaintiff's Second Amended

Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and/or for summary judgment

pursuant to Federal Rule of Civil Procedure Rule 56.[3]  (Dkt. No. 45.)  The remaining Defendants

have moved for summary judgment dismissing Plaintiff's Second Amended Complaint.[4]  (Dkt.

No. 48.)   For the reasons set forth below, the Court recommends that Defendant Jessmer's

motion for summary judgment be **<u>GRANTED</u>**, and that the remaining Defendants' motion for

summary judgment be **<u>GRANTED</u>** in part and **<u>DENIED</u>** in part.

---

[1]  Plaintiff's Second Amended Complaint was dismissed as against named Defendant Security Staff of Ogdensburg Correctional Facility by the December 7, 2010, Decision and Order of District Court Judge David N. Hurd.  (Dkt. No. 17 at p. 5.)

[2]  Page numbers in citations to filed documents refer to the page numbers assigned by the Court's CM/ECF system rather than to the page number in the original document.

[3]  Defendant Jessmer's Notice of Motion placed Plaintiff on notice that Jessmer was moving to dismiss and/or for summary judgment.  (Dkt. No. 45.)  Because both parties have submitted material outside of the Second Amended Complaint, along with Statements of Material Facts, and the material submitted by the parties has been considered by the Court, Jessmer's motion is being treated as one for summary judgment.  *See Barmore v. Aidala,* 419 F. Supp. 2d 193, 196 (N.D.N.Y. 2005) (court may treat a motion to dismiss as a motion for summary judgment where the opposing party has notice that the court is being asked to consider the motion pursuant to Rule 56, and the opposing party has a reasonable opportunity to present evidence in opposition).

[4]  The Defendants' motions have been referred to me for Report and Recommendation by Judge Hurd, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).  (August 3 and August 6, 2012 text entries.)

## I.      BACKGROUND

### A.      Plaintiff's Disbursement of Funds Requests

On August 12, 2009, Plaintiff received life insurance proceeds in the amount of

$10,710.46 as a result of his wife's passing.  (Dkt. No. 18 at p. 9;[5] Dkt. No. 52-3 at pp. 23-24.)

Plaintiff submitted a disbursement request on August 20, 2010, requesting that $3,800 of the

funds he had received be disbursed to John Ng ("Ng") of Oakland Gardens, New York.  (Dkt.

No. 48-9 at p. 12.)  Department of Corrections and Community Supervision ("DOCCS")

Directive No. 2798, § III(A)(1)(c) requires that inmate disbursement requests in excess of $100

be approved in writing by the Superintendent or his or her designee.[6]  (Dkt. No. 48-10 at p. 2, ¶

6.)  When a request exceeding the $100 threshold is made, it is transferred from the Ogdensburg

Business Office to the inmate's guidance counselor for preliminary review and then to the

security staff where an investigation is completed and a determination made on the request.

(Dkt. No. 48-9 at pp. 3-4, ¶¶ 8-12; Dkt. No. 48-10 at pp. 2-3, ¶¶ 8-9.)  The procedure is followed

---

[5]  A verified complaint is to be treated as an affidavit for summary judgment purposes.
*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).  However, Plaintiff's Second Amended
Complaint appears to be unverified.  (Dkt. No. 18.)  Nonetheless, because the Second Amended
Complaint has been incorporated by reference into Plaintiff's sworn Affidavit in opposition to
Defendants' motion for summary judgment, it will treated as a part of that Affidavit and
considered in opposition to both of the motions now before the Court.  (Dkt. No. 52-4 at p. 2, ¶
5.)

[6]  The copy of DOCCS Directive 2798 annexed as Exhibit A to Defendant Susan
McLear's ("McLear") Affidavit has an effective date of September 16, 2011, a year after
Plaintiff's disbursement request.  (Dkt. No. 48-10 at pp. 7-10.)  However, the Affidavits of
Defendants McLear and Lawrence Kanaly ("Kanaly") sufficiently establish that the requirement
was included in the version of Directive No. 2798 applicable during the relevant time period.  *Id.*
at p. 2, ¶¶ 6, 8 and p. 7; Dkt. No. 48-9 at pp. 3 and 5, ¶¶ 9 and 17.  Furthermore, Plaintiff has
admitted to being familiar with Directive 2798 regarding disbursement requests over $100 and
does not deny paragraph 6 of Defendants' Statement Pursuant to Rule 7.1(a)(3) setting forth the
requirement.  (Dkt. No. 48-2 at p. 2, ¶ 6; Dkt. No. 52-1 at pp. 6-7, ¶¶ 6 and 8 .)

without question as per the DOCCS policy. (Dkt. No. 48-4 at p. 2, ¶ 4; Dkt. No. 48-9 at p. 3, ¶ 9.)

Disbursement requests referred to security at Ogdensburg are generally given to the Security Captain, a position held by Defendant Kanaly in 2009. (Dkt. No. 48-9 at p. 3, ¶ 10.) The Security Captain assigns a Sergeant or number of Sergeants, depending on staffing, to investigate the legitimacy of the request. *Id.* Investigations are usually accomplished through a Sergeant or Sergeants conducting an interview or series of interviews with the inmate to determine if the request is "viable, appropriate and/or represents any security concern to the facility." *Id.*

Inmate disbursements are a significant area of concern in prisons, and investigation of requests is a critical tool in the effort to keep contraband, drugs, and other security risks from entering the prison environment. *Id.* at p. 4, ¶ 13. Money from inmate disbursements has been found to be one of the chief pipelines for drug purchases and other illegal contraband, as well as for payment for illegal services performed inside the prison. *Id.* Therefore, the investigating Sergeant's primary concern is in verifying the legitimacy of the disbursement. The investigator weighs such factors as the identity of the payee and his or her relationship with the inmate requesting the disbursement, and the accuracy of information provided by the inmate.[5] *Id.* at p. 4, ¶ 11.

Kanaly recalls that the investigation of Plaintiff's request to send $3,800 to Ng, which included numerous interviews, left the Sergeants involved with concerns about the relationship

---

[5] Disbursement requests are also investigated to rule out the possibility that the inmate is the victim of an extortion scheme. (Dkt. No. 48-9 at p. 5, ¶ 15.)

between Plaintiff and Ng, Ng's non-family status, and with ambiguities concerning the purpose

for the disbursement. *Id*. at p. 6, ¶ 18.  In his disbursement request, Plaintiff identified the

purpose for the request as "Funds Sent Home." *Id*. at p. 12.  However, in an August 24, 2009

letter to Defendant Lawrence Sears ("Sears"), Superintendent at Ogdensburg, Plaintiff wrote that

he wanted to give Ng a long time family friend, the $3,800 as a reward "for bailing [plaintiff] and

[his] 26 year old son out of jail." (Dkt. No. 48-9 at pp. 14-15.)  In a grievance filed following

denial of his disbursement request, Plaintiff explained the reason for the request in the following

manner: "[A]s promised, I requested that 3,800.00 be disbursed from my inmate account and sent

to a long time family friend to whom helped us on so many occasion in the past and bailed me

and my son out of jail just last year." *Id*. at p. 21.  In his deposition in this lawsuit, Plaintiff

claimed that he wanted to send Ng the money to use to support Plaintiff's children.  (*See, e.g.*,

Dkt. No. 52-3 at pp. 39-40.)  Although the Plaintiff's deposition occurred after the disbursement

request investigation, Kanaly has averred that the ambiguity between Plaintiff's claim to Sears

that he wanted to reward Ng with the money, and his deposition testimony that he wanted to use

it to support his children, is similar in type and character to the ambiguities that were uncovered

during the investigation of Plaintiff's request. *Id*. at p. 7, ¶ 22.  The ambiguities with respect to

Plaintiff's relationship to Ng included Plaintiff's various descriptions of Ng as "a longtime

family friend," his "personal executor," his "power of attorney," and his "go to guy." *Id*. at p. 7,

¶ 21.

Kanaly, acting as Sears' designee, denied Plaintiff's $3,800 disbursement request because

of  Ng's non-family status, ambiguities concerning the purpose for the disbursement, and the

relatively large amount of money being requested. *Id.* at p. 6, ¶ 18.  Plaintiff received the notice

of denial of his disbursement request for security reasons on August 28, 2009. (Dkt. No. 52-2 at p. 32.) Plaintiff thereafter filed Grievance No. 6420-09 challenging the denial with Defendant Gerry Molnar ("Molnar"), Inmate Grievance Coordinator at Ogdensburg. *Id.* at pp. 32-33; Dkt. No. 48-9 at p. 19. The grievance was denied by majority vote of the Inmate Grievance Review Committee ("IGRC") following a September 2, 2009, hearing. (Dkt. No. 52-2 at p. 33.) Defendant Sears also denied Plaintiff's grievance. *Id.* at p. 34. CORC denied his appeal by notice of October 21, 2009. *Id.* at p. 36.

On September 2, 2009, following the denial of his grievance, Plaintiff submitted a disbursement request for a payment of $95 to Ng. *Id.* at pp. 33 and 51. That request was processed and the disbursement issued the following day. *Id.* at p. 33. However, a second $95 disbursement request to Ng submitted five days later, on September 7, 2009, was forwarded to security, despite being under $100, and was denied. *Id.* at pp. 34-35 and 52. According to Kanaly, the request was denied because Plaintiff's series of requests for lower value disbursements to Ng after the denial of his $3,800 disbursement request raised red flags from a security perspective, given the findings in the investigation on the initial $3,800 request. (Dkt. No. 48-9 at pp. 7-8, ¶¶ 23 and p. 27.) Plaintiff contends that Defendant David Doty ("Doty") recommended to Plaintiff that he return the proceeds from his late wife's life insurance to his attorney, Melvin Simensky ("Simensky"). (Dkt. No. 52-2 at p. 34.) Plaintiff thereafter submitted a request to send $3,800 Simensky – the exact amount he had attempted to send to Ng.[6] *Id.* at pp.

---

[6] In an October 6, 2009 letter to Simensky, Plaintiff described his requested $3,800 disbursement to Simensky as being for services rendered, which conflicts with his claim that he was sending the money back to Simensky at Doty's recommendation and the notation on the disbursement request "Funds sent back to my Attorney." (Dkt. No. 52-2 at pp. 54 and 58.)

35 and 57.

Plaintiff's request for disbursement of funds to Simensky was forwarded to security. *Id.* at p. 35. Plaintiff was called to an interview with Defendant Scott Patak ("Patak") concerning the request and explained to Patak that Doty had recommended that the funds be sent back to Simensky. *Id.* at p. 36. According to Plaintiff, Patak made a few calls, found out Plaintiff had filed a grievance, and told Plaintiff he was denying the disbursement request because he had no way of confirming that Simensky was an attorney. *Id.* Plaintiff's request to disburse $3,800 to Simensky was denied. (Dkt. No. No. 52-2 at p. 58.) Neither Plaintiff's claim that Patak told him that he was going to deny the request after learning of the grievance nor the facts and circumstances surrounding the ultimate denial of Plaintiff's request for a $3,800 disbursement to Simensky have been addressed by Defendants in their motion papers.[7]

After Plaintiff was transferred to Otisville Correctional Facility, requests for disbursements for his children through Ng in sums from $100 to $400 were allowed. (Dkt. No. 52-3 at pp. 23 and 45, 48.) Plaintiff requested the smaller disbursements because of the problems he had at Ogdensburg with the larger request. *Id.* at p. 49. Plaintiff was also allowed to transfer funds to Ng when he was subsequently moved to Wallkill Correctional Facility. *Id.* at p. 23.

### B. Multiple Searches of Plaintiff's Cubicle

Plaintiff claims that he was subjected to a series of four cubicle searches ordered by

---

[7] Defendant Patak has not submitted an affidavit addressing Plaintiff's claim against him as did the other Defendants accused of participating in the denial of Plaintiff's disbursement requests. Furthermore, Kanaly did not address the investigation of the request to send money to Simensky or the grounds for denial in his Affidavit, and he did not rule out Patak's involvement in the decision making process as he did with regard to the other Defendants implicated by Plaintiff. (*See* Dkt. No. 48-9.)

Defendant Kanaly in retaliation for his submission of Grievance No. 6420-09 and an October 31, 2009 FOIL request seeking information as to the basis for the denial of his September 7, 2009, $95 disbursement request. (Dkt. No. 52-4 at pp. 15-16.) Plaintiff's cubicle was searched by Defendant Correction Officer Joseph Balcom ("Balcom") on the afternoon of October 31, 2009; in the morning of November 2, 2009, by Defendant Correction Officer Richard Frary ("Frary") and in the afternoon of the same day by Defendant Correction Officer Robert Currier ("Currier"); and by Defendant Balcom on the afternoon of November 6, 2009. *Id.* Defendants contend that the searches, with the exception of one done by mistake on November 2, 2009, were all performed pursuant to Ogdensburg's cell/cubicle search protocol and not in retaliation for any action by Plaintiff. (*See generally* Dkt. No. 48-8.)

Defendant James LaFave ("LaFave") was Housing Unit Sergeant with oversight over the Ogdensburg housing units during the time of the cubicle searches. *Id.* at p. 1, ¶ 1. LaFave has provided a description of the random cell/cubicle search protocol at Ogdensburg. *Id.* at pp. 2-3. According to LaFave, cell/cubicle searches are authorized by DOCCS Directive 4910.[8] Searches of specific cells/cubicles within a unit are conducted randomly according to a computer generated list. *Id.* at pp. 4-5, ¶ 8. The list, known as the "Daily Cube Frisk," is given by the Security Commander to the Watch Commander, who gives it to the Housing Sergeant. *Id.* The Housing Sergeant assigns the searches to a Correction Officer. *Id.* No one has any discretion as to which

_____

[8] As with DOCCS Directive 2798, the effective date of the copy of Directive 4910 submitted in support of Defendants' motion, December 13, 2011, post-dates the events relevant to Plaintiff's claims. However, the LaFave Affidavit supports a finding that special unannounced and routine cell/cubicle searches for contraband, as provided for in Directive 4910 Section V(A)(3), were a responsibility of facility management and were deemed essential to the discovery and elimination and contraband at the time the challenged searches took place. (Dkt. No. 48-8 at p. 2, ¶ 6 and p. 18.)

cells are to be searched.  *Id*. at p. 3, ¶ 9.  In LaFave's experience, with forty or fifty cells/cubicles in a housing unit, it is not particularly rare for a cubicle to be selected by the computer for multiples searches in the same week or even on the same day.  *Id.* at p. 3, ¶ 11.

After Plaintiff filed Grievance No. 6349-09 (Dkt. No. 52-2 at pp. 64-66) complaining of the multiple searches, LaFave conducted an investigation and concluded that none of four the searches of Plaintiff's cubicle had been excessive, retaliatory, or handled improperly in any way.[9] (Dkt. No. 48-8 at p. 4, ¶ 14.)  However, LaFave did discover that he had made an administrative error in connection with the double search on November 2, 2009, when the computer generated list included a search of Plaintiff's cubicle, number 32B, in the afternoon only.  *Id.* at p. 4, ¶ 16 and p. 35.  LaFave confused Plaintiff's cubicle number with cubicle 22B, which was included on the list for a morning search when he assigned the searches.  *Id*. at p. 4, ¶ 16.  The computer generated lists for October 31, 2009, and November 6, 2009, both included Plaintiff's cubicle. (Dkt. No. 52-1 at pp. 24 and 26.)

No contraband or otherwise illicit material was found in the searches complained of by Plaintiff, and Plaintiff was not disciplined in any way, nor did he suffer any disciplinary punishment.  (Dkt. No. 48-8 at pp. 4-5, ¶ 18; Dkt. No. 52-1 at pp. 27-29.)  Plaintiff's Grievance No. 6349-09 was denied by the IGRC following a hearing held on November 24, 2009.  (Dkt. No. 52-2 at p. 40.)  CORC upheld the denial of Plaintiff's grievance writing:

> CORC notes that frisks are computer generated, however, Sergeant
> L . . . did assign Officer F. . . to conduct a cube frisk on the
> grievant on 11/2/09 during Tour II, in error.  Further, the grievant

---

[9]  According to Plaintiff, LaFave met with him as a part of his investigation of the searches and told him that the searches were random in nature and that Plaintiff was not being harassed.  (Dkt. No. 52-2 at p. 9.)

is reminded that searches are a necessary part of correctional
security activity and are designed to promote the safety of all
concerned by interception of contraband and by deterring inmates
from possession of contraband.

(Dkt. No. 48-8 at p. 41.)

### C. Plaintiff's FOIL Requests

Plaintiff had two FOIL requests denied by Defendant Helga Ross ("Ross"), the FOIL

Officer at Ogdensburg. Plaintiff's first FOIL request, dated October 31, 2009, was for a copy of

the original written decision denying his September 7, 2009, request for disbursement of $95.00

to Ng. (Dkt. No. 52-2 at p. 37.) Plaintiff sent the request to Ross. (Dkt. No. 48-12 at p. 6.)

Ross's duties included reviewing and determining inmates' FOIL requests. *Id.* at p. 1, ¶ 1. Ross

responded to Plaintiff's FOIL request with an explanation that "[t]he record you request does not

exist. F.O.I.L. Guidelines do not require that a record be created to satisfy a request. This was a

security investigation that stemmed from an initial disbursement request that was denied." (Dkt.

No. 48-12 at ¶ 5 and p. 10.) Ross has averred that her denial of Plaintiff's first FOIL request was

not based upon a retaliatory or discriminatory motive, but on the fact that the requested document

did not exist and, therefore, could not be produced. *Id.* at p. 2, ¶ 6. Plaintiff has submitted no

evidence to the contrary.

Plaintiff's second FOIL request, made to Ross on December 4, 2009, asked for copies of

the computer generated documents utilized in the hearing on Plaintiff's Grievance No. 6349-09.

(Dkt. No. 52-2 at p. 40.) Plaintiff's request noted that he was entitled to the documents because

they were used as evidence in chief in the grievance hearing, and he needed them for his appeal.

*Id*. at p. 8. Ross denied the request on the grounds that "[r]elease of the requested record may

endanger the life and safety of an individual or compromise security concerns related to the safe and orderly operation of a correctional facility. The computer generated documents are confidential and not to be released into the inmate population." (Dkt. No. 48-12 at p. 3, ¶ 8 and p. 12.) Ross contends that her denial of Plaintiff's second FOIL request was appropriate because "release of documents regarding the cell searching procedure, protocol and bearing specifics of certain cell searches on a particular series of days implicate significant security considerations to the facility." *Id*. at p. 3, ¶ 9.

Each of Ross' response to Plaintiff's FOIL requests contained the following notice:

> YOU MAY APPEAL ANY DENIALS OR DELETIONS BY WRITING TO THE OFFICE OF COUNSEL, DEPARTMENT OF CORRECTIONAL SERVICES, STATE CAMPUS, BLDG. #2, ALBANY, NEW YORK 12226. THE WRITTEN APPEAL MUST (1) IDENTIFY THE RECORD YOU HAVE BEEN DENIED, (2) GIVE DATE AND LOCATION OF YOUR ORIGINAL REQUEST, AND (3) GIVE YOUR NAME AND ADDRESS.

*Id*. at pp. 10 and 12. Plaintiff did not appeal from the denial of either of his FOIL requests. (*See* Dkt. No. 48-11.)

### D.    Plaintiff's Mail Tampering Claim

On or about November 8, 2009, Plaintiff sent legal mail to his attorney, Simensky, via certified mail return receipt requested.[10] (Dkt. No. 52-2 at p. 38.) In it, he informed Simensky of the denials of his requests to send his own funds to both Ng and Simensky and enclosed a copy of his Grievance No. 6439-09 relating to the cubicle searches, which had been filed the

---

[10]  Defendant submitted a disbursement request to send Simensky correspondence by certified mail return receipt requested on November 7, 2009. (Dkt. No. 45-5 at p.4.) The request was approved on November 10, 2009. *Id*.

same day as the letter to Simensky.  *Id*.  In his Second Amended Complaint, Plaintiff has alleged

that Defendant Philip Jessmer ("Jessmer"), Mail Room Clerk at Ogdensburg, took it upon

himself to sabotage or intercept Plaintiff's letter to Simensky in an obvious ploy to see what he

was sending his attorney and to harass or intimidate him in retaliation for Plaintiff's grievances

and his October 31, 2009, FOIL request.  *Id*. at pp. 38-39.

Plaintiff's mail tampering retaliation claim appears to have arisen out of a mail room

error which resulted in Plaintiff mistakenly being given the return receipt on another inmate's

certified mail.  (Dkt. No. 45-2 at p. 2, ¶ 6; Dkt. No. 45-4 at p. 9.)  Despite claiming that his mail

was sabotaged, Plaintiff has admitted to being unsure whether he received a certified mail receipt

showing delivery of his letter to Simensky and to not knowing whether Simensky ultimately

received the letter.  (Dkt. No. 45-4 at pp. 10-11.)  According to Plaintiff, Simensky did tell him

he had not yet received the letter when they spoke sometime in November 2009.  *Id*. at p. 26.

When deposed by Jessmer's counsel, Plaintiff conceded that Jessmer had played a very

small part in the whole issue, and that Jessmer had been listed as a Defendant because he was the

Mail Room Clerk, and under the "mailbox rule," once Plaintiff deposits his mail, the mail room

clerk is responsible for it until it is turned over to the post office.  *Id*. at pp. 22 and 29.  Jessmer,

who denies knowing Plaintiff or having any knowledge regarding grievances filed by Plaintiff,

and further denies opening Plaintiff or anyone else's outgoing mail, has conceded that an error

was made in giving Plaintiff the return receipt on another inmate's certified mail.  (Dkt. No. 45-2

at p. 1, ¶¶ 3-4.)  However, Jessmer denies sending Plaintiff's mail to the wrong person and is

unaware of any effort to withhold or delay Plaintiff's outgoing mail.  *Id.* at p. 2, ¶¶ 8-9.

**E.     Alleged Intimidation by Defendant Doty**

According to Plaintiff, he met with Defendants Doty and Corrections Sergeants Light and Haven concerning his September 7, 2009, request to send $95 to Ng.  Plaintiff claims that Doty told him very bluntly that the $95 requests would not be tolerated. (Dkt. No. 52-2 at p. 34.) When Plaintiff asked Doty why he could not send $95 from his account, since there was no directive disallowing it, he was told by Doty in a very threatening manner to get out of his office, and that Doty had better not receive another disbursement form from him.  *Id.*

**F.     Plaintiff's Claims Against Defendant Molnar**

Plaintiff claims that during the hearing on his Grievance No. 6349-09 things became heated and uncomfortable.  Defendant Molnar is alleged to have taken it personally and to have done everything in his power to deny Plaintiff's grievance.  Plaintiff claims that Molnar did, in fact, deny his grievance.  (Dkt. No. 52-2 at p. 40.)  However, the evidence shows that Molnar was a non-voting member of the IGRC and had absolutely no discretion or input into grievance determinations by the IGRC and did not have any role in deciding Plaintiff's grievances.  (Dkt. No. 48-13 at pp. 2-3, ¶¶ 4 and 7.)

Plaintiff also contends that Molnar withheld computer generated documents that were key evidence against him on his appeal of the grievance denial to CORC.[11]  (Dkt. No. 52-2 at p. 40.) According to Molnar, his primary function with regard to CORC appeals is administrative.  (Dkt. No. 48-13 at p. 3, ¶ 10.)  He puts together all of the documents that were part of the record before

_____

[11]  Presumably those computer generated documents were the Daily Cube Frisk lists requested by Plaintiff in his second FOIL request and ultimately submitted by Plaintiff in opposition to Defendants' motion for summary judgment. (*See* Dkt. No. 48-13 at p. 3, ¶ 8.)

the IGRC and sends the materials to CORC.  *Id.*  According to Molnar, he has no role in, or

authority with regard to, what documents are provided to inmates for grievance appeals.  (Dkt.

No 48-13 at p. 3, ¶ 9.)

### G.    Plaintiff's Defamation Claim

In his Second Amended Complaint Plaintiff claims that during a tour of his housing unit,

Defendant Sears defamed his character by telling Plaintiff that he was denying his request to send

funds home because the funds were illegally gained and were being sent out for further illegal

activity, namely a drug deal.  (Dkt. No. 52-2 at p. 35.)  At his deposition, Plaintiff testified that

Sears made the defamatory statement in the presence of Defendants Marian Charlebois

("Charlebois"), Patricia Burnell ("Burnell"), and Kanaly.  (Dkt. No 52-3 at pp. 59 and 63.)

According to Plaintiff, as a result of Sears' defamatory statement, a black and white picture of

him with a notation that he was to be searched when he entered and left the yard was placed in a

box stationed in an area where it was seen by other inmates.  *Id.* at pp. 60-63.

## II.    APPLICABLE LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence, that no genuine issue of material fact

exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF)., 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999) (Pauley, D.J.), citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

A.     **Plaintiff's Claims For Money Damages Against the Defendants in Their Official Capacities**

Defendants seek dismissal of Plaintiff's § 1983 claims for money damages against them in their official capacities.[12]  (Dkt. No. 1 at ¶¶ 9-10, 12-16.; Dkt. No. 23-1 at pp. 19-20.)  The

---

[12]  Defendant Jessmer, whose motion is separate from that of the other Defendants, has not specifically moved to dismiss Plaintiff's claim for money damages against him in his official capacity on Eleventh Amendment grounds.  However, the Court recommends that the claim be dismissed *sua sponte* for the same reason that dismissal is recommended against the other

Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006)) and bars all money damages claims against state officials acting in their official capacities, including the moving Defendants herein. *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985); *see also Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (an inmate plaintiff's claims for damages against individual Department of Correctional Services employees sued in their official capacities are considered claims against New York and, therefore, are barred by the state's Eleventh Amendment immunity.) Therefore, I recommend that all of the Defendants be granted summary judgment dismissing Plaintiff's §1983 claims for money damages against them in their official capacities.[13]

### B.    Plaintiff's Retaliation Claims

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak*, 389 F.3d at 381-83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such

---

Defendants. *See Johnson v. Enu*, No. 08-CV-158 (FJS/DRH), 2011 WL 3439179, at *7, 2011 U.S. Dist. LEXIS 86831, at *19 (N.D.N.Y. July 13, 2011) (Homer, M.J.) (District Court is empowered to dismiss claims *sua sponte* pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(iii)).

[13] Judge Hurd previously dismissed all of Plaintiff's claims for monetary damages for mental anguish and plain and suffering under the Prison Litigation Reform Act, 42 U.S.C. §1997e(e) because he had alleged no physical injury. (Dkt. No. 17 at p. 5.)

retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983),

*overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). As the Second

Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are
> difficult to dispose of on the pleadings because they involve questions
> of intent and are therefore easily fabricated. Second, prisoners' claims
> of retaliation pose a substantial risk of unwarranted judicial intrusion
> into matters of general prison administration. This is so because
> virtually any adverse action taken against a prisoner by a prison
> official--even those otherwise not rising to the level of a constitutional
> violation--can be characterized as a constitutionally proscribed
> retaliatory act.

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), *overruled on other*

*grounds*, *Swierkiewicz,* 534 U.S. 506.

To defeat summary judgment on a First Amendment retaliation claim, a plaintiff must

provide evidence that (1) the speech or conduct at issue was protected, (2) the defendants took

"adverse action" against the plaintiff – namely, action that would deter a similarly situated

individual of ordinary firmness from exercising his or her constitutional rights, and (3) there was

a causal connection between the protected speech and the adverse action – in other words, that

the protected conduct was a "substantial or motivating factor" in the defendants' decision to take

action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287

(1977); *Pidlypchak*, 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492); *Williams v. Temple*, 349

Fed.Appx. 594, 596 (2d Cir. 2009), *cert. denied*, ___ U.S. ___, 131 S.Ct. 241 (2010) (citing *Scott*

*v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003)).

Several factors may be considered in determining whether a causal connection exists

between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot*, 224

F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.

1995)). Those factors include: (i) the temporal proximity between the protected activity and the

alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a

hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.*

(citing *Colon*, 58 F.3d at 872-73). "The causal connection must be sufficient to support an

inference that the protected conduct played a substantial part in the adverse action." *Id.* The

Second Circuit has held that the passage of "only six months" is sufficient to support an inference

of a causal connection. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (citing

*Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 555 (2d Cir. 2001)).

1. <u>Denial of Plaintiff's Request for a $3,800 Disbursement to Ng in
Retaliation for Filing a Grievance</u>

Plaintiff contends that Defendants Baldwin, Charlebois, Burnell, Kanaly, Sears, and

possibly McLear denied his request for a disbursement of $3,800 to Ng in retaliation for the

filing of a grievance. (Dkt. No. 52-2 at p. 32.) Defendants, with the exception of Jessmer, have

conceded that the filing of grievances and FOIL requests are both protected First Amendment

conduct. (Dkt. No. 48-3 at pp. 13-14.) *See Davis v. Goord*, 320 F.3d 346, 352-53 (2d Cir. 2003)

(the right to file grievances is a constitutionally protected activity for retaliation purposes).

The denial of a disbursement request arguably constitutes an adverse action for purposes

of Plaintiff's retaliation claim. However, the evidence clearly establishes that there was no

causal connection between Plaintiff's grievance and the denial of his disbursement request.

Plaintiff claims that Defendant McLear told him that his disbursement request was going to be

approved, but since Plaintiff had filed a grievance, Defendants Baldwin, Charlebois, Burnell,

Kanaly, and Sears had decided to deny the request. (Dkt. No. 52-2 at p. 32.) However, Plaintiff

has himself conceded that he did not file a grievance with regard to the denial of his

disbursement request until after he had received notice that his request had been denied. *Id*. The

grievance itself specifically indicated that it was being submitted "as a result of [the

administration's] unfair, arbitrary and capricious action against me by denying me the right to

access my inmate account and send money home," leaving no doubt but that the denial of the

request preceded the grievance. (Dkt. No. 48-9 at p. 21.) Since the grievance was not filed until

after the disbursement request was denied, logic dictates that the denial could not have been in

retaliation for filing a grievance.

Furthermore, before Section 1983 damages may be awarded against a defendant, a

plaintiff must show that the defendant was personally involved – that he was a direct participant

in the alleged constitutional violations. *Colon,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright v. Smith*,

21 F.3d 496, 501 (2d Cir.1994). The un-refuted evidence shows that it was Defendant Kanaly

who ordered the security investigation in his capacity as Security Chief, and who, as Sears'

designee under Directive 2798 § III(A)(1)(c), made the decision to deny Plaintiff's disbursement

request. (Dkt. No. 48-9 at p. 7, ¶ 24; Dkt. No. 48-10 at p. 7.) According to Kanaly, Defendants

Baldwin, Charlebois, Burnell, Sears, and McLear, against whom Plaintiff has asserted claims for

retaliation, had no involvement in the decision to deny the request.[14] (Dkt. No. 48-9 at p. 7, ¶

_____

[14] The evidence, refuted only by Plaintiff's conclusory assertions, establishes that
Baldwin, Charlebois, Burnell, Sears, and McLear had no involvement in the denial of Plaintiff's
disbursement request. Correction Counselor Baldwin's role in disbursement requests in excess of
$100 is limited to trying to determine the relationship between an inmate and the person to whom
he wants to disburse funds and then forwarding the request to Security Office at Ogdensburg
where an investigation is done on the validity of the disbursement. Baldwin has no role in
security investigations and no authority or input into the determination as to whether a

24.)  Given the proof of lack of involvement of those Defendants in the denial of Plaintiff's

request for a disbursement of $3,800 to Ng, Plaintiff's retaliation claim against them would be

without merit even if the denial had not been made before the grievance was filed.

Defendants would still be entitled to summary judgment dismissing the retaliation claim

even if Plaintiff had sustained his burden of establishing protected conduct, adverse action, and

causal connection, because Defendants have offered uncontroverted evidence that Kanaly would

have denied Plaintiff's $3,800 disbursement request in the absence of protected First Amendment

conduct.  *See Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir. 2002); *see also Lowrance v. Achtyl,*

20 F.3d 529, 535 (2d Cir. 1994) (". . . the conclusion that the state action would have been taken

in the absence of improper motives is readily drawn in the context of prison administration where

---

disbursement request is granted or denied.  She played no part in the decision to deny Plaintiff's
disbursement request. (Dkt. No. 48-6 at pp. 2-3, ¶¶ 6-11.)  As Deputy Superintendent for
Programs, Charlebois oversees the administration of inmate programs, including therapeutic,
academic, and vocational. She is not a security official, takes no part in the decision to
investigate a disbursement request, and has no authority or input into security's decision making
process regarding inmate accounts.  Charlebois had no role in the denial of Plaintiff's
disbursement request.  (Dkt. No. 48-5 at pp. 1-3.)  Burnell, as Deputy Superintendent for
Administration, has oversight over the administration departments, including maintenance, mess
hall, personnel, and fiscal and stores.  She has no discretion or input in the decision making
process or ultimate determination of inmate's requests for disbursements of over $100.00.
Burnell had no role in the denial of Plaintiff's request other than to send an August 28, 2009
memorandum to Plaintiff responding to his letter to Sears regarding the disbursement request and
preparing a memorandum for the IGRC explaining the reason for the denial in connection with
Plaintiff's grievance. (Dkt. No. 48-7 at pp. 1-4, 6, and 8.)  Ogdensburg Superintendent Sears
had no personal input in the investigation or determination of Plaintiff's disbursement request
because those duties were carried out by Kanaly as Sears' designee.  Sears did not learn of the
denial until Kanaly informed him in connection with Plaintiff's continued submission of lesser
value disbursement requests in what was viewed as an apparent attempt to skirt the original
denial.  (Dkt. No. 48-4 at p. 2, ¶ 5.)  McLear, Institution Steward at Ogdensburg, plays absolutely
no role in the investigation of an inmate's disbursement request and has no authority or input into
the decision whether to approve or deny the request given the strong evidence presented by
Defendants with regard to the reasons for denial of the second $95 request.  (Dkt. No. 48-10 at p.
3, ¶ 10.)

we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage.") (citations and internal quotation marks omitted). Inmate disbursements have been identified as a significant area of concern in prisons and investigation of disbursement requests, as required under Directive 2798, has been described as a critical tool in keeping contraband, drugs, and other security risks out of prisons. (Dkt. No. 48-9 at ¶ 13.) Kanaly's conclusion that the ambiguities in information given by Plaintiff during the investigation of his request, as well as the large amount of the request, warranted denial for security reasons constituted an appropriate exercise of discretionary authority on his part. (Dkt. No. 48-9 at ¶ 21.)

In light of the foregoing, the Court recommends that Plaintiff's claim that the denial of his request for a $3,800 disbursement to Ng was made in retaliation for the filing of a grievance be dismissed.

2.     <u>Denial of Plaintiff's September 7, 2009, Request for Disbursement of $95.00 to Ng in Retaliation for Filing a Grievance</u>

When Plaintiff submitted an interview slip to McLear asking the status of his September 7, 2009, request for a disbursement of $95.00 to Ng, McLear responded that she had forwarded to security, and it was being investigated. (Dkt. No. 52-2 at p. 33.) According to McLear, the request was sent to security, despite it being under the $100 threshold set forth in Directive 2798, § III(A)(1)(c), because Plaintiff's request for the $3,800 disbursement to Ng had already been investigated and denied. (Dkt. No. 48-10 at pp. 3-4, ¶¶ 12 and 13.) McLear explained that when the first request for a disbursement is denied by security, another request to the same person would raise a red flag and as a matter of course be sent to security, even if it was for less than

$100.[15]  *Id*. at p. 4, ¶ 13.  McLear played no role in the investigation or denial of the request.  *Id.* at p. 4, ¶ 15.  According to Kanaly, the request raised the same security concerns as the $3,800 request and was denied by him for the same reasons.[16]  (Dkt. No. 48-9 at p. 7, ¶ 23.)

The September 7, 2009, disbursement request was made after Plaintiff had filed his grievance over denial of the request for a $3,800 disbursement to Ng, thereby satisfying the protected conduct requirement for a retaliation claim.  Furthermore, denial of a disbursement request arguably constitutes an adverse action for purposes of a retaliation claim since an inmate's ability to access his personal account, even for such thing as meeting the needs of his family, is entirely dependent upon the approval of prison officials.  However, both McLear and Kanaly have averred that their actions with regard to Plaintiff's request were not made in retaliation for the filing of grievances, but for specifically identified security reasons, and Plaintiff has made nothing more than a bald assertion of retaliation, unsupported by evidence in opposition.  (Dkt. No. 48-9 at pp. 8-9, ¶ 27; Dkt. No. 48-10 at p. 4, ¶ 15.)

In addition, as with the denial of the request for a $3,800 disbursement to Ng, even if Plaintiff had sustained his burden of establishing protected conduct, adverse action, and causal

---

[15]  A September 2, 2009, request for a $95 disbursement to Ng was approved in a day. (Dkt. No. 52-2 at pp. 33 and 51.)  Neither McLear nor any of the other Defendants has explained why Plaintiff's September 2, 2009 request for a $95 disbursement to Ng was approved in a day, despite the $3,800 request.  In fact, Kanaly indicated that after denial of the $3,800 request, Plaintiff continued to make a series of smaller requests which were denied.  (Dkt. No. 49-8 at p. 7, ¶ 23.)  Although the Court would have expected the Defendants to explain the approval of the first $95 request and denial of the second less than a week later, the omission does not change the recommended outcome based upon the evidence that was submitted.

[16]  Although Plaintiff has alleged that Defendant David Doty told him that the $95.00 disbursement requests would not be tolerated and to stop making them, there is no evidence that anyone other than Kanaly was responsible for denying the request.

connection, Defendants have offered uncontroverted evidence that Kanaly would have denied Plaintiff's disbursement request in the absence of protected First Amendment conduct. *See Gayle* 313 F.3d at. 682. Therefore, the Court recommends that Plaintiff's retaliation claim with regard to the denial of the $95 disbursement request of September 7, 2009, be dismissed.

### 3. Denial of Plaintiff's Request to Disburse $3,800 to Simensky in Retaliation for Filing a Grievance

Plaintiff claims that his request to send $3,800 to his attorney Simensky was denied by Patak in retaliation for the grievance filed by Plaintiff. (Dkt. No. 52-2 at p. 36.) The Defendants have not addressed Plaintiff's claim in their motion for summary judgment. As the movants, Defendants have the burden of showing through admissible evidence that there are no material issues of fact and they are entitled to judgment as a matter of law. *See Liberty Lobby*, 477 U.S. at 251-52. Other than the denial notation on the face of Plaintiff's disbursement request, the only evidence submitted by Defendants specifically with regard to the denial of Plaintiff's request to send money to Simensky is a general statement that the request would have been sent from McLear's office to guidance and then on to security where the procedures for requests over $100 would be followed. (Dkt. No. 48-10 at p. 4, ¶ 14.)

Because Kanaly has acknowledged that it was his responsibility to oversee security investigations done on disbursement requests in excess of $100, and that he was Sears' designee in making decisions on those requests (Dkt. No. 48-9 at p. 3, ¶ 10 and p. 6 at ¶ 18), and because Plaintiff has specifically implicated Patak in the denial with no response to the allegation or explanation from Patak or Kanaly in Defendants' motion, the Court recommends that Defendants' motion for summary judgment with respect to Plaintiff's request to disburse $3,800

to Simensky be denied as against Defendants Patak and Kanaly.[17]

4.     Intimidation by Defendant Doty in Retaliation for Filing a Grievance

Plaintiff has also claimed that Defendant Doty spoke to him in an intimidating and demeaning manner in connection with his September 7, 2009 disbursement request, telling him that the $95 requests would not be tolerated and telling him in a threatening manner to leave his office and that he had better not do it again. (Dkt. No. 52-2 at p. 34.)  Claims of verbal abuse alone, unaccompanied by injury, do not state a constitutional violation cognizable under Section 1983.  *See Aziz Zarif Shabazz v. Pico*, 994 F.Supp. 460, 474 (S.D.N.Y. 1998).  Moreover, "verbal harassment, or even threats, are generally held not to rise to the level of adverse action that will support a First Amendment retaliation claim."  *Rosales v. Kikendall*, 677 F. Supp. 2d 643, 647 (W.D.N.Y. 2010).  Doty's comments to Plaintiff, while Plaintiff may have found them intimidating, would not be expected to deter a person of ordinary firmness from exercising his constitutional rights and do not constitute adverse action for purposes of a First Amendment retaliation claim.  Therefore, the Court recommends that Plaintiff's retaliation claim against Defendant Doty be dismissed.

5.     Searches of Plaintiff's Cubicle in Retaliation for Grievance No. 6420-09 and his October 31, 2009, FOIL Request

"Periodic cell searches are so much an integral part of prison life that in *Hudson v. Palmer*, 468 U.S. 517, 527-28, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the United States Supreme Court held that a prisoner has no reasonable expectation of privacy in his prison cell."

---

[17] It appears that Defendants may have a failure to exhaust administrative remedies defense with respect to Plaintiff's retaliation claim based upon the denial of his request to send $3,800 to his attorney since there is no evidence that Plaintiff grieved the denial.  However, Defendants have not raised the argument on their motion.

*Jones v. Harris*, 665 F. Supp. 2d 384, 394 (S.D.N.Y. 2009).   Even cell searches "conducted

solely for harassment" do not implicate the Fourth Amendment.  *See Willis v. Artuz*, 301 F.3d 65,

68-69 (2d Cir. 2002).  "The only constitutional limit on the search of a prison cell is imposed by

the Eighth Amendment's bar against cruel and inhuman punishment . . .  – which is to say, if the

cell search lacked any legitimate penological interest and was intended solely to harass – then it

may be actionable."  *Jones*, 665 F. Supp. 2d at 95.  The evidence submitted in support of

Defendants' motion for summary judgment establishes that there is a legitimate penological

interest in computer generated cell/cubicle searches.  The searches, which are recognized as an

integral part of maintenance of a secure prison environment, give the staff an opportunity to

locate and confiscate contraband such as weapons and drugs, before it infiltrates into the prison

population.  (Dkt. No. 48-8 at p. 2, ¶ 6.)  Therefore, Plaintiff does not have, nor has he attempted

to assert, an Eighth Amendment claim with respect to the cubicle searches.

Plaintiff does, however, claim that the cubicle searches were undertaken in retaliation for

Plaintiff's grievance from the denial of his request to send $3,800 to Ng and his FOIL request for

a copy of the written decision denying his September 7, 2009, request for a $95 disbursement to

Ng.  (Dkt. No. 52-2 at pp. 15-16.)  Although the issue has not been decided by the Second

Circuit, a number of District Courts in the Circuit have concluded that since prisoners have no

constitutional protection from cell searches, even those conducted for retaliatory reasons do not

give rise to a constitutional claim.  *See Bumpus v. Canfield*, 495 F. Supp.2d 316, 327 (W.D.N.Y.

2007) (a cell search done for retaliatory reasons does not implicate a constitutional right since a

prisoner has no reasonable expectation of privacy in his prison cell); *Lashley v. Wakefield*, 367 F.

Supp. 2d 461, 470 (W.D.N.Y. 2005) (same); *Salahuddin v. Mead,* No. 95 Civ. 8581 (MBM),

2002 WL 1968329, at *5, 2002 U.S. Dist. LEXIS 15827, at *17-18 (S.D.N.Y. Aug. 26, 2002) (Mukasey, D.J.) (same).[18]

Even if the allegedly retaliatory searches could give rise to a constitutional violation in this case, and the searches were determined to constitute adverse action, the evidence does not support a causal relationship between Plaintiff's filing of a grievance and a FOIL request and the cubicle searches. Defendants have established that the searches were the result of a computer generated list, not in retaliation for Plaintiff's protected First Amendment conduct. (Dkt. No. 48-8 at p. 4, ¶ 14.) Plaintiff has offered nothing more than conclusory assertions and speculation in opposition. Furthermore, Defendants have offered uncontroverted evidence that the random searches of Plaintiff's cubicle, necessary to maintain a secure prison environment, would have occurred in the absence of Plaintiff's protected conduct. *See Gayle*, 313 F.3d at 682.

In light of the foregoing, the Court recommends that Plaintiff's claim that the cubicle searches were conducted in retaliation for his exercise of protected First Amendment rights be dismissed.

5. <u>Tampering with Plaintiff's Mail in Retaliation for Filing a Grievance</u>

Plaintiff's claim that Ogdensburg Mail Room Clerk Jessmer tampered with a certified letter to his attorney Simensky is completely without merit, and the Court recommends that

---

[18] In *Phelan v. Hersh*, Civ. No. 9:10-CV-0011 (GLS/RFT), 2011 WL 6031940, at *6, 2011 U.S. Dist. LEXIS 140025, at *20-21 (N.D.N.Y. Sept. 13, 2011) (Treece, M.J.), the Court found that where something more than a cell search occurs, *i.e.*, where the corrections officer conducting the search tears up the inmate's cell and locker, manipulates and damages his legal papers, and threatens to fight the inmate, a valid claim for retaliation may be stated. Plaintiff does not claim that the searches themselves were conducted in an improper manner or that any damage was done to his belongings. Moreover, the evidence in this case establishes that no contraband was found and Plaintiff was not punished and did not suffer any disciplinary punishment in connection with the searches. (Dkt. No. 48-8, at pp. 4-5, ¶ 18.)

Jessmer's motion for summary judgment be granted.[19]  As previously noted, in the Second

Circuit, a defendant's personal involvement in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.  *See Colon*, 58 F.3d at 873; *Wright,* 21 F.3d at

501.  Jessmer has denied knowing Plaintiff, has denied knowledge of any grievances filed by

Plaintiff, and has denied looking at Plaintiff's outgoing mail or sending Plaintiff's mail to the

wrong address.  (Dkt. No. 45-2, at p. 1, ¶¶ 1-3.)  Plaintiff has offered no evidence whatsoever to

the contrary.  In fact, Plaintiff has admitted that Jessmer played a very small role in the alleged

tampering and conceded that Jessmer was sued because he was the Mail Room Clerk.  (Dkt. No.

45-4 at pp. 22 and 29.)  Plaintiff does not even know for sure whether he received the return

receipt on the letter to Simensky or whether Simensky received the letter.  *Id*. at pp. 10-11.

     Furthermore, District Courts in the Second Circuit have generally held that mail

tampering, even if it had occurred, does not constitute adverse action for purposes of a retaliation

claim.  *See, e.g., Tafari v. McCarthy*, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010); *Battice v.

Phillip*, No. CV-04-669 (FB)(LB), 2006 WL 2190565, at *6, 2006 U.S. Dist. LEXIS 53407, at

*19-20 (E.D.N.Y. Aug. 2, 2006) (Block, S.D.J.) (failure to deliver Plaintiff's mail on one

occasion does not constitute the type of conduct that would deter an individual of ordinary

firmness from exercising his First Amendment rights).  Therefore, Plaintiff's mail sabotage claim

would be subject to dismissal even if Plaintiff had shown Jessmer's personal involvement.

---

[19]  Although interference with legal mail can implicate a prisoner's right of access to the
courts and free speech under the First and Fourteenth Amendments, *see Davis*, 320 F.3d at 351,
Plaintiff has not submitted any evidence suggesting that he was denied access to court or
damaged in any other way by the alleged mail tampering.

6.      Denial of Plaintiff's FOIL Requests in Retaliation for Filing Grievances

It appears that Plaintiff may be claiming that his FOIL requests were denied by Defendant Ross in retaliation for filing grievances.  The evidence submitted on Defendants' motion establishes that the first FOIL request was denied because the requested document did not exist and the second for prison security reasons.  According to Ross, neither was denied for retaliatory reasons.  (Dkt. No. 48-12 at p. 2, ¶ 6 and p. 3, ¶¶ 8 and 9.)  Plaintiff has submitted no evidence to the contrary.  *See Salahuddin*, 467 F.3d at 272-73 (once defendants meet their burden, plaintiff is required to produce evidence demonstrating that there is a material issue of fact.)  Absent evidence of a causal connection between Plaintiff's protected First Amendment conduct – his grievance or grievances in this case – and the denial of his FOIL requests, Plaintiff cannot establish a retaliation claim.  *See Pidlypchak*, 389 F.3d at 380 (retaliation claim requires a causal connection between the protected speech and adverse action).  Furthermore, Defendants' evidence shows that the FOIL requests would have been denied even in the absence of Plaintiff's protected First Amendment conduct.  *See Gayle*, 313 F.3d at 682.  Therefore, the Court recommends that Plaintiff's retaliation claim against Defendant Ross be dismissed.

C.      **Plaintiff's Equal Protection Claim**

Plaintiff claims that he was discriminated against in violation of the Equal Protection Clause of the Fourteenth Amendment.  More specifically, Plaintiff contends that he was treated differently than other inmates in the denial of his request to disburse a large sum of the money

that had come to him.[20]  (Dkt. No. 52-3 at p. 50-56.)

The Equal Protection Clause requires the government to treat similarly situated people alike.  *See City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)*.*  It is most commonly used to assert claims of discrimination based upon membership in a protected class. Where, as in this case, Plaintiff has not claimed membership in a protected class, violations of the right to equal protection may be actionable as class of one claims.  *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010), *cert. denied*, ___ U.S. ___, 131 S.Ct. 2970 (2011).  A class of one claim exists "where the plaintiff alleges that [he or] she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Analytical,* 626 F.3d at 140 (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

In order to succeed on a class-of-one-claim, a plaintiff must establish that:

> (I) no rational person could regard the circumstances of plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

*Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir. 2005)*, overruled on other grounds, Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).[21]  There must be an "extremely high" level of similarity

---

[20]  It is not clear which of the Defendants are being accused of violating Plaintiff's right to equal protection. Presumably it was Plaintiff's intention to assert the claim against the same Defendants against whom he has asserted retaliation claims related to the denial of his disbursement requests.

[21]  *Appel* recognized that  *Neilson* was overruled by *Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591 (2008) insofar as it involved a public employee asserting a class of one claim.  Its articulation of the elements of a class of one claim remain intact.  *See Analytical*, 626

between the plaintiff and the persons with whom he compares himself. *Neilson*, 409 F.3d at 104. Furthermore, class of one plaintiffs are required to prove "intentional disparate treatment, that is, [they must] demonstrate the decision makers were aware that there were other similarly-situated individuals who were treated differently." *Analytical*, 626 F.3d at 143 (quoting *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir. 2001) (internal quotes omitted)).

Plaintiff has failed to identify a single comparator in similar circumstances from whom he was treated differently and has failed to demonstrate the Defendants were aware that similarly-situated individuals were treated differently. Furthermore, Defendants have established security concerns as a rational basis for the denial of Plaintiff's disbursement requests. (*See generally* Dkt. No. 48-9.) Given the foregoing, the Court recommends that Plaintiff's equal protection claim be dismissed.

### D.      Denial of Plaintiff's FOIL Requests

Defendants seek dismissal of Plaintiff's claim that his FOIL requests were improperly denied on the grounds that Plaintiff failed to exhaust his administrative remedies as mandated under the Prison Litigation Reform Act of 1995, 42 U.S.C.A. § 1997e(a), which provides in relevant part:

> No action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. §1997e(a). Section 1997e(a) requires using all administrative steps that an agency holds out and doing so properly. *Amador v. Andrews*, 655 F.3d 89, 95-96 (2d Cir. 2011).

_____

F.3d at 140, n. 1.

Exhaustion is mandatory, and unexhausted claims may not be pursued in federal court. *Id*. at 96.

The three-part inquiry articulated in *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)[22] discloses no grounds for excusing Plaintiff from the exhaustion requirement with regard to his FOIL requests. First, Plaintiff had an available administrative remedy from the denial of his FOIL requests. He could submit a written appeal to the DOCCS Office of Counsel and was so advised in the denials of his FOIL requests. He failed to do so. (Dkt. No. 48-12 at pp. 10-12.) Second, Defendants have raised failure to exhaust as an affirmative defense in their Answer (Dkt. No. 52-4 at p. 28, ¶ 35), and there is no evidence that Defendants took any action to prevent Plaintiff from appealing from the denials. Third, Plaintiff has failed to submit evidence showing the existence of any special circumstances that prevented him from appealing the FOIL denials. Therefore, Plaintiff's FOIL claims are barred under Section 1997e(a) due to his failure to exhaust his administrative remedies.

Even if Plaintiff's FOIL claim were not barred for failure to exhaust, it would be subject to dismissal. Several District Courts in the Second Circuit have held that a plaintiff has no property interest in the satisfactory handling of FOIL requests. *See, e.g.*, *Murray v. Coleman*, 737 F. Supp. 2d 121, 126 (W.D.N.Y. 2010) (no constitutionally protected right to the satisfactory handling of a FOIL request, and denial of a FOIL request cannot form the basis for a Fourteenth

---

[22] The Second Circuit has yet to decide whether the *Hempill* three-part inquiry has survived the Supreme Court decision in *Woodford v. Ngo*, 548 U.S. 81 (2006) (requiring proper exhaustion of administrative remedies, including properly using all steps that the agency holds out, so that the issues can be addressed on the merits). *See Amador*, 655 F.3d at 102 (questioning but not deciding whether the doctrines of estoppel and special circumstances survived *Woodford*). In the absence of guidance from the Second Circuit, District Courts generally continue to apply the *Hemphill* inquiry. *See, e.g., Case v. Smith*, No. 9:10-CV-888 (NAM/TWD), 2012 WL 4107812, at *1, 2012 U.S. Dist. LEXIS 134736, at *2 (Sept. 19, 2012) (Mordue, D.J.).

Amendment due process claim where a plaintiff has failed to take advantage of state law procedures for appealing from the denial) (citing *Simpson v. Town of Southampton*, No. 06-CV-6743 (JFB) (WDW), 2007 WL 1755749, at *4, 2007 U.S. Dist. LEXIS 43649, at *14 (E.D.N.Y. June 15, 2007) (Bianco, D.J.))

Given the foregoing, the Court recommends that Plaintiff's claim against Defendant Ross for denial of his FOIL requests be dismissed.

### E. Plaintiff's Claim Against Defendant Molnar

Plaintiff claims that Molnar denied his grievance over the cubicle searches and mail tampering and withheld copies of the computer generated documents related to the cubicle searches that were essential to his appeal to CORC. (Dkt. No. 52-2 at p.40.) Molnar has provided detailed denials of both claims in his Affidavit. (Dkt. No. 48-13.) Plaintiff, on the other hand, has provided no evidence in support of his claims. It is unclear whether Plaintiff's claim against Molnar is one for an alleged denial of his Fourteenth Amendment due process rights in connection with the grievance process or for retaliation. Since Defendant Molnar has established that he had no personal involvement in either the denial of Plaintiff's grievance or the alleged withholding of documents on Plaintiff's appeal to CORC, Plaintiff cannot prevail on either.[23] *See Colon*, 58 F.3d at 873 (defendant must have directly participated in the alleged

___

[23] *See also Torres v. Mazzuca*, 246 F. Supp.2d 334, 342 (S.D.N.Y. 2003) ("Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment," although an inmate has the right to appeal from the denial of a grievance and seek court review if alleged constitutional rights were not satisfactorily redressed by the prison grievance system). As to a retaliation claim against Molnar, since the evidence establishes that he had no involvement in denying Plaintiff's grievance or withholding records from the appeal, there can be no finding of a causal connection between Plaintiff's protected First Amendment conduct and the alleged retaliatory actions. *See Pidlypchak*, 389 F.3d at 380.

constitutional violation to be subject to a claim for money damages under Section 1983).

Therefore, the Court recommends that Plaintiff's claim against Defendant Molnar be dismissed.

### F.     Plaintiff's Defamation Claim

Plaintiff has asserted a state law defamation claim against Defendant Sears based upon his statement that he was denying Plaintiff's request to send funds home because the funds were illegally gained and were being sent out for a drug deal. (Dkt. No. 52-2 at p. 35.) Generally a state defamation action against a government official "cannot be converted into a federal action for loss of liberty under the Due Process Clause of the Fourteenth Amendment." *Patterson v. City of Utica*, 370 F.3d 322, 328 (2d Cir. 2004); *see also Paul v. Davis*, 424 U.S. 693, 709 (1976). This case appears to be no exception.

"In the absence of original federal jurisdiction, the decision of whether to exercise supplemental jurisdiction over pendent state claims is within the court's discretion. *Butler v. LaBarge*, No. 9:09-cv-1106 (GLS/DRH), 2010 WL 3907258, at *3, 2010 U.S. Dist. LEXIS 104701, at *9, 2010 WL 3907258, at *3 (N.D.N.Y. Sept. 30, 2010) (Sharpe) (citing *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 121-22 (2d Cir. 2006)). The Court has recommended that Plaintiff's federal claims against Defendant Sears be dismissed. When all federal claims are eliminated before trial, the balance of factors in deciding whether to exercise jurisdiction over remaining state law claims leans toward dismissal. *Kolari*, 455 F.3d at 122.

A court may choose to exercise jurisdiction if a state law claim raises an important issue of federal policy. *See id.* at 122-23. Here, Plaintiff has not established a federal claim or raised an important issue of federal policy. Therefore, in light of the Court's recommendation that Plaintiff's federal claims against Defendant Sears be dismissed, dismissal of Plaintiff's state law

defamation claim against Defendant Sears is also recommended.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendant Jessmer's motion for summary judgment (Dkt. No. 45) be **GRANTED** and that the Plaintiff's Second Amended Complaint be dismissed as against him; and it is further

**RECOMMENDED** that the remaining Defendants' motion for summary judgment (Dkt. No. 48) be **GRANTED** and the Plaintiff's Second Amended Complaint be dismissed as to all of the Defendants and all of the claims asserted by Plaintiff, with the exception of Plaintiff's claim for retaliation in connection with the denial of his request to disburse $3,800 to his attorney Melvin Simensky as against Defendants Patak and Kanaly; and it is hereby

**RECOMMENDED** that with respect to that claim, Defendants Patak and Kanaly's motion for summary judgment be **DENIED**.

Dated: February 19, 2013
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge